Good morning, Your Honors. Jennifer Kemp, Supervising Deputy Attorney General, on behalf of the Director. Now, you're going to proceed with your entire argument and reserve whatever time you want. Is that right? Yes, Your Honor. Okay. For all three cases? Yes, Your Honor. Unless you would like for me to do it differently. No, I think that would be fine. Okay. And I would like to reserve five minutes for rebuttal. Okay. And watch your own time. Thank you. All right. Your Honors, the District Court's decision should be reversed for four reasons. Number one, the District Court failed to look at congressional intent with respect to 830A when it did a Supremacy Clause adjudication of the lower court proceedings. What do you mean by that? In light of orthopedic, isn't that pretty well settled in our circuit? Your Honor, I will get to that. No, orthopedic is not what is controlling on this issue, and I will explain why. I'm sorry. I'm not hearing you. Is this better? Yes. Orthopedic is not controlling on this issue, and I will explain why. This was brought as a Supremacy Clause cause of action. And as all the parties here admit, congressional intent is the touchstone of a Supremacy Clause cause of action. Now, Congress's intent with respect to 30A is that 30A requires the state to look at efficiency, economy, and quality of care, which I will refer to as EEQ. But it does not require the state to do what is called cost-based rates. Yes, but we said in orthopedic hospital that it does. So I don't understand how we're going to backtrack on that, and this is what I meant by my earlier comments. The opinion exists, and it sets out what it believes to be what Congress intended by this standard. And now you're saying it doesn't, and you may be right. I mean, it's a tough case, but that's where it is. Your Honor, and I appreciate that comment about orthopedic. Orthopedic is not controlling on this issue, and here's the reason why. Orthopedic was decided at a time when the Boren Amendment was in effect. And the Boren Amendment affirmatively required states to set cost-based rates. But it didn't rely on the Boren Amendment. It was not about the Boren Amendment. It was about a different section of the Boren Amendment. I understand that. If I may just continue, I will hopefully address your question. Let me get to the bottom line. Are you asking us to overrule orthopedics? Ms. Tana. I'm not asking this Court to overrule orthopedics. What I'm arguing is that the narrow portion of orthopedic that required cost-based rates was reversed and does not survive this Court's decision in Sanchez, which also revisited that narrow issue. But Sanchez is so distinguishable in so many ways. Sanchez doesn't even mention orthopedic, doesn't mention it at all. Moreover, it's a three-judge panel. It had no authority to overrule another three-judge panel. And it dealt with the Boren Amendment. And under our Alaska Department of Health case, we specifically held that the Boren Amendment modified Section 13A alone had no effect on 30A. So I'm just following up on what Judge Berzon said. We want you to use your time effectively, but I think you're kind of whistling past the graveyard. If you want us to overrule effectively orthopedic, that's binding precedent in our circuit. Yes, Your Honor. Orthopedic was not affirmatively overruled by Sanchez in terms of mentioning orthopedic and saying that this Court overrules it. And it is true that a third- Sanchez was about a procedural question, which was whether the lawsuit could be brought in the way it was brought. And it was not about any substantive. And affirmatively, it was not about what the substantive rule was that would apply. And then we have the Alaska case after Sanchez specifically applying substantively the orthopedic rule. Your Honor, if I may just answer that question. Sanchez did more than just say that a procedural requirement of 30A is the only thing that decision was addressed. Sanchez affirmatively revisited the issue of how to do an EEQ analysis under 30A. Well, let me ask you something also. This isn't only an EEQ analysis. There's also an access question here, which seems like a much more determined, which was not an issue in Sanchez and is a much more specific and less vague standard, no? That is true. And I will address the access issue and why the district court's decision should be reversed with respect to access. But just to finish up and follow up the line of questioning having to do with orthopedics, Sanchez revisited that narrow portion of orthopedics that dealt with the EEQ analysis and provided base rates. Sanchez said that the EEQ analysis has to be done in a way that balances competing factors, not based on cost-based rates. Sanchez said that the efficiency and economy provision of EEQ is for the benefit of taxpayers, and that that has to be balanced with the quality of care provision, which benefits the beneficiary. And then this would be a really good argument in a petition for a hearing on bank, or even in a petition for first argument for an initial hearing on bank. But we are just in no position to accept then an opinion which didn't mention an earlier one and which can easily be seen as much narrower overall. Your Honor, the argument thus far has been that Sanchez does not apply because it dealt with a 1983 cause of action and we're dealing with a supremacy clause here. No, because it dealt with the question of whether you could bring the case and not with a substantive standard. But Sanchez did much more than that. It actually looked at the EEQ provision. And if I can just mention Alaska because that was brought up by the panel. Alaska mentioned orthopedic not in the context of the provider-based cost rate that was required in orthopedic. Alaska was brought not by providers suing. It was brought by the federal agency, CMS, suing because state new rates violated the federal upper limit. Meaning that the reimbursement rates were too high, not too low. And because it was too high, it violated the EEQ provision because when a state does the balancing of- But the bottom line was that the EEQ position was enforceable, and your bottom line is it isn't. No, Your Honor, our position is not that the EEQ provision is not enforceable. The state must look at efficiency, economy, and quality of care. But it does not have to look at provider cost. That is not a requirement in the plain language of the statute. It is a requirement only in a narrow portion of orthopedics, which, as I've stated and as our papers have stated, yes, that narrow portion has been overruled by Sanchez. It's almost so narrow to me, but what about the access issue? The access issue. With respect to the access issue, it's addressed in the district court's opinion in the irreparable injury section of the decision. And the district court's decision is completely in error because what the district court did was shift the pertinent proof from the moving party, which is the petitioners, to the department to show whether or not the access provision- I'm a step before that. The orthopedic case also dealt with the access issue, and that was not even discussed with Sanchez, so your whole argument doesn't apply to that. So as to the access issue, there's still a cost-based requirement, and frankly, I think there is as to everything. Whether it's right or wrong, and I can understand very much your arguments about why it's perhaps not an appropriate rule, but it is the rule. But what about the access issue? Your Honor, it's true. Orthopedic and Sanchez does not address the access issue. Yes, it does address it. It addresses it. It says that there was no direct access problem, but nonetheless, the payments had to comply with the access rule and had to have cost-based data in order to do that. The orthopedic decision said that the department or state has to look at provider costs when doing the EEQ analysis. Has when doing the access. And then it did not require that provider cost rates have to be required when one looks at only access. However, with respect to access, Your Honor, the statute clearly says that what it's required a state to do is to ensure that access- No, it's to set rates that will ensure access. And rates for the beneficiary, Your Honor, not for the provider. Well, the whole thing is for the beneficiaries primarily. That is true. And so what the access provision does, it requires the state to ensure that access is equal in a geographical area for the Medi-Cal population as it is for the general population. That is the only requirement in the plain language of the statute. What the district court needed to do was to look at the competing evidence and then put the burden of proof on the moving parties. The position for the burden of proof in the district court to show that the access level in a specific area was not equal for the Medi-Cal beneficiaries as it was for- Back up a minute. Is the thrust of your position that if orthopedic hospital applies, you lose? Your Honor, no. You're assuming- Okay, why don't you argue under orthopedic hospital for a while, assuming it applies? Assuming it applies. Assuming it applies, the district court's decision should still be reversed because the district court stated, and here's the basis of the decision, respondent, quote, proffered no evidence showing that the department considered any of the relevant factors. What the record shows, and it is clear, is that the department submitted nearly two dozen declarations showing exactly the reasonably principled analysis that the department was required to do. It details what the department looked at as far as the EEQ provisions were concerned and what the access provisions were concerned with. And the declarations laid out for all the various provider categories. But under Lance Counsel versus McNair, isn't the standard that if the district court believed that the petitioners showed the likelihood of success, all they needed to do was to show the possibility of irreparable harm in order to meet the injunction standard? Your Honor, the Fifth Circuit and the Seventh Circuit directly address the issue of what a petitioner needs to show in order to meet that burden. There is no public- You're not to mute, I'm sorry. Of what- I hope you can hear me better. Of what a petitioner needs to show to meet that burden of proof. You mean in order to get injunctive relief? Your Honor- You're saying that we shouldn't rely on a Ninth Circuit unanimous en banc opinion that sets the standard. We're going to rely upon the standard set by the Fifth and the Seventh Circuit? Is that what you're telling us? Your Honor, the McNair decision did not say, as simply put as Your Honor has stated, that all the petitioners need to show is some violation of- No, I'm just saying that is the standard in our circuit under Lance Counsel versus McNair from last year. That is the standard if the district court believes that there is a likelihood of success on the merits on the part of the petitioners. All they have to do is show the possibility of irreparable harm. Didn't the district court find that there was actually more than a possibility of irreparable harm? Didn't she specifically cite several instances in each category of the petitioners to show that there would in fact, in her view, be irreparable harm? What the district court did was conflate two things and reached one decision with respect to irreparable harm. The district court needed to see whether or not petitioners were able to show that there was a violation of the access provision. And then if there was, see whether or not that would result in irreparable injury. What the district court did was conflate the two and just look at competing declarations without looking to see whether or not there was sufficient access to a service in a geographical area that was equal to the general population. But that's because she understood the orthopedic hospital requirement to be a procedural one as to what was considered in making the decision. And which of the affidavits, first of all, many of the declarations go to aspects of provider costs that were not in fact enjoined. And so they seem to have been persuasive to the district judge, at least on the irreparable harm piece. So we're left with the ones that go to physicians, dental, optometrists, pharmacists, adult health care. There are probably a couple other things. As to those, what in them demonstrates compliance with the orthopedic hospital requirement? I know you don't like the orthopedic hospital requirement. I know you hate the orthopedic hospital requirement. But what in it demonstrates compliance with the requirement? Your Honor, I will first direct the Court's attention to the declaration submitted on the Adult Day Healthcare Center, the ADHC. The declaration submitted by the Department show that ADHC services are not generally available to the general public. That, in fact, those services are more available to people in the Medi-Cal program. And so two declarations from petitioners saying that a certain provider not have closed but may close. First of all, is there any evidence that anybody did any of this work before the legislature just put in an across-the-board 10 percent cut? First of all, if I can. Yes, there is. Okay. No, there was no stipulation. That has been the allegation by both the interveners and petitioners. Well, no study was done before the legislature passed this, was there? Your Honor. It wasn't published in the register before it was passed. There is no requirement for the Department to actually publish. Well, that's your interpretation of orthopedic, right? Orthopedic did not require a published analysis or published study. Oh, you wrote a study. Where was the study that was done before the legislature passed this? It's in the declaration. And if I can take your answer to that. Do you have a citation to the record? I will find one for you. Okay. And I will provide it in rebuttal so I can go back and look at it. Okay. But, Your Honor, if I can go back for one second to address your question about orthopedic and the requirement of a study. Orthopedic stated that an analysis under 830A was far less strict and more flexible than that which was required under the Boren Amendment. This Court hold enfolding that even under the stricter requirements of the Boren Amendment, that the only thing required was not a... I thought we agreed that our Alaska case said that the Boren Amendment only dealt with 13A, not 30A. And we're talking about 30A here, are we not? That's true. So, the Boren Amendment has nothing to do with it. Well, orthopedic mentions the Boren Amendment. Let's say you're right. Let's say that you could take a soft view of orthopedic and amalgamate the two standards and turn it into a reasonable decision-making standard. Okay. What was done here before... I mean, obviously, what was driving here was the legislature wanted to cost down 10 percent, period, the end. The legislative analyst said, don't do this with regard to a group of providers, not hospitals, but others, because you're going to impair the quality and the access and so on. And they did it anyway. What evidence is there that any reasonable decision-making process that took into account the criteria in the statute went into that? The legislation was enacted in February of 2008. It did not go into effect until July 1 of 2008. Before July 1, the department started its reasonably principled analysis. And it's important for me to point out that the analysis the department needs to do is not anything formal, does not have to be produced in writing. And even orthopedic acknowledged that by saying that the standards were less strict. Well, what orthopedic says is that the director has to, and I'm quoting here, rely on responsible cost studies and to consider costs. And then I'm quoting again, when setting reimbursement rates. So the legislature didn't rely on anything, did it? It just passed it because it needed to cut the budget. The legislature is not required under 30A to do or not to. Whoever sets the rates is required to do it. So who set the rates? Wasn't it the legislature? The legislature enacted it, and the department has to implement it. Could the department have just ignored the action of the legislature and said, we don't want to do it? Well, in this case, there was a five-month lag between the enactment. No, no, I understand there was a lag. But after that lag, could the department have said to the legislature, we don't like what you did, so we're not going to implement it? Well, Your Honor, I believe what the department is entitled to do and should do. And would have done is if the analysis before July 1 had shown that there would be some violation of 30A, the department would have gone to the legislature and spoken with the committee members. Good luck going to the legislature and speaking to them. You know, the law is passed by the legislature, and it's the law. If the department doesn't like it, they could go back. Anybody could go to the legislature and say, you did a bad thing when you passed that law. But that doesn't mean that the law is going to be changed. The law is the law which the department has to implement unless the legislature changes it. Here, the lawsuit was brought under a violation of 30A. 30A specifically requires that a state plan amendment has to do, and then it lists the criteria. The state plan amendment is submitted to CMS by the department. By the way, has one ever been submitted on this, on a 10% cut? Yes. It has been? Has it been acted on? It takes CMS a long time to approve it. So it has not, to my knowledge, officially been approved. One question. Let me tell you what my view of the record is, or at least in general. You started in the right place. I think your strongest argument is on the adult health care. Because, as I understand it, there are cost studies on the nursing homes, and this is a percentage of the nursing homes. And there's an argument that you kind of eyeball it and say that to pay less, you know, that much less for adult health care, given the fact that these people are not staying overnight, is likely to come out to the same percentage. So there's an argument there. There's maybe some argument in the pharmacies, which we can get into. I've seen nothing done with regard to the doctors, the dentists, or the optometrists, for example, with regard that gives you any cost sense at all. The cost sense, and let me, if I may, I don't know if the Court is conceding on pharmacy and ADHD. No, I'm not. I'm just saying, just on a gradation. First of all, because none of them was done in advance, so that's problem A. And B, there's a great debate about the quality of that work. But leaving that aside, I see nothing about costs with regard to the individual medical providers. Well, let me mention the studies that were submitted about the costs. Actually, costs were submitted on nearly all of them. ADHD, as the Court mentioned, yes. Not directly. It's very indirect and it's arguable. But let's go to the places where I don't see it at all and tell me why you think it's there. The NEMTs, which is the non-emergency medical transportation services. Now, I asked you about three specific categories, doctors, dentists, optometrists. Let's do those first. For the doctors, the evidence that was submitted by the Department was that there has never been, even under the federal guidelines, a cost study been done on the over 12,000 costs. So basically, there was no cost study. There wasn't one. Your Honor, it's impossible to do. To do a cost study on over 12,000 rates and to require – You're assuming that you'd have to do it on each individual rate. Well, that's what is being asked and required to do when the state is required to do a cost-based rate. One must look at the cost and see how to set each individual rate. And that is what is going to be imposed on the Department if the Department is required to do cost-based rates. But bottom line is no such study was done. For physician services. And there were no numbers at all? Informal, informal, or any other kind? As to provider costs on physician services, no. Dental services, optometry services. For dental services, that's true. And for optometry services, I don't believe it was done. And, however, we're looking at the district court's decision here, and that is the issue before this Court. But you're arguing that the district court incorrectly applied the law. And the sum of your argument is that, in effect, we should ignore orthopedic and treat the Boren Amendment as if it is controlling here and that that somehow changes what the district court did. Isn't that correct? It's not because of the Boren Amendment that the narrow portion of orthopedic does not survive. It's because of what this court did in Sanchez, what this court did in Baldy Rogers, what this court did in Alaska. If, arguendo only, of course, if I told you that there is no possibility that this panel would agree with you on that point, what would your next argument be? My argument would be that the district court's decision. Fifty seconds, because you want to talk. Yes. It's very accurate. It started on this slide at the beginning. Your Honor, the district court stated that the department submitted no evidence on the analysis that was done. And you're saying as to at least some of the subcategories it's true. The department submitted almost two dozen declarations, 20-some declarations. But the bulk of them went to providers that were not being enjoined, as to which were not being enjoined. You won, at least temporarily. No, Your Honor. A lot of the declarations were submitted at the pharmacy services. The bulk of them, most of them, went to categories as to which there was not an injunction in effect. And others of them went to this, and that's what we're trying to do. We're trying to dig into the record. Unless there's – you haven't addressed at all the 11th Amendment issue. If you want to, you can have a minute or two on that. Or you can do it in rebuttal, as you please. If I could take one minute to do – to address the requirement that this court seems to be taking a position on, which is that the department has to do its analysis before implementation. Your Honor, that issue has never been directly addressed by this court. However, it has been addressed by the Fifth Circuit and the Seventh Circuit. And both circuits have affirmatively held that states are not required to do studies in advance of implementation or legislation of new rates. The Seventh Circuit decision, especially in Methodist Hospital, pointed out the impossibility of doing an access analysis before a rate change is put into effect. But essentially, the Seventh Circuit position is that you can have a couple years of violations, no never mind. I don't think it's that extreme, Your Honor. The Seventh Circuit decision is that states use a reasonable method of setting rates. And if it turns out that it is too low, then the state should be given an opportunity to go back and amend it. Meanwhile, people are getting medical care they're supposed to be getting under the statute. Well, that's not necessarily true. Well, it is necessarily true if we wait for an access violation and then fix it after it's happened. But that's not what's going on here. There has been no evidence that the access provision is being violated in any set geographical area. The district court's decision... That's not the question. I was talking about the legal standards. The legal standard that you're arguing for is one that would say, let them do whatever they want. And sometime after the fact, if somebody could demonstrate that there wasn't access... First of all, the statute isn't written that way. It says you have to provide assurances, not that you're supposed to look at it after the fact. The statute is requiring a result. And it doesn't set forth what the department has to do to get to the result. The statute, what it actually says is... Let me see if I can find it here. It seems to be written in procedural terms. It says that what you have to provide is methods and procedures relating to the payment of care and services available under the plan as may be necessary to assure that payments are consistent with efficiency and economy and quality of care and that services are available, at least to the extent that such care and services are available to the general population. So it is written in procedural terms. But there is no timing requirement. And there is a reason for that. It is reasonable... Could you do it 10 years after the fact? Well, why not say 100 at that point? Imagine people dead everywhere. Does that matter? The reason... No, Your Honor. Does it matter? No, obviously it would not be reasonable to say 10 years after the fact. But the reason why there is no set timing requirement in the plain language... Isn't that why orthopedics says you've got to do it in advance? Because the statute contemplates, at least according to our President, that before you set this, you've got to take this into account. Because there are real people with real problems and businesses that serve those people who may not continue to provide services if this is not done. Your Honor, orthopedics did not state when a study has to be done. Well, it has to be done before. Before the rates are set. In orthopedics, the studies were done after the fact. There is no Ninth Circuit decision on point that requires the state to do studies ahead of implementation. It says that orthopedics says that the director has to rely on responsible cost studies when setting the reimbursement rates. How can you rely on something that has not yet been prepared? That has to do with what the department has to prove in terms of the analysis. We talked about this before. Didn't the legislature set this? Yes, the legislature did. As Judge Reinhart said, is the department free to ignore what the legislature did? Can it set its own rates? We don't like to set percent stuff. Let's go with 15. Can it do that? Obviously, the department is not a legislative... So, the legislature set the rate, right? Yes. And so, if orthopedics says what I just quoted, and I assure you that it did, or does rather, then it didn't rely on such studies when it set the rates. There is no evidence in the record that the legislature did not look at all of the different... Are we to assume that there's no evidence that it didn't? Are we to assume that it did? Your Honor, the purpose of a legislative analyst's office in preparing the study and sending it to the committee that will look at the budget is so that all of the different factors can be considered. Just because the words... But the legislative analyst said that this was not a responsible plan at this point, and essentially said that you can't demonstrate meeting the federal standards, with regard to the particular providers that are now enjoined. Those pesky legislative analysts. Although the department's position still is that the legislature is not required to look at or consider any of the A38 provisions, in answering that question, the legislature, if it were to have to look at EEQ the way EEQ is supposed to be looked at, which is a balancing of competing factors... But not your study with orthopedics. I mean, that's what you're doing. You're saying not the orthopedic way, and not even the Folden way, but the Sanchez way. What you believe to be the Sanchez way. Yes, Your Honor. What you believe to be the Sanchez way. And, Your Honor, there is no requirement, even under orthopedic, that the legislature have to look at any study or do anything with the A38. This is the hard part of this case. I mean, it could be that you're right, that this 10% cut, if it was procedurally done right, could demonstrate that there was no actual real problem here. But at some point, suppose there's a terrible problem still in the California legislature. Suppose tomorrow the way they decide to balance the California budget is to take another 10% out of Medi-Cal. Then what? Well, Your Honor, the real fear is that, because of the ongoing fiscal crisis, that the state may have to cut services. What the state did here was reduce reimbursement rates. What is the answer to your question? You know, of course the legislature might do anything tomorrow. But Judge Verzan's question is suppose they decide to take another 10% cut. That's not inconceivable. Could they do that without any study of any kind, without any reason other than that there's a fiscal crisis? Are they free to do that? They're free to do it, but are they free to do it and still get the federal money? Well, the Director's position still is that 30A does not require the legislature to do or look at any specific study before enacting the law. There are many times when the legislature can do that. No further implementation. It can go into effect the next day. Let's cut out the five months that you say that you were looking at it, although we don't know to what end. But suppose they say tomorrow we're cutting it 10%. The legislature can do whatever the legislature wants. Of course they can do it, but the question is, does somebody then have a claim that there's a violation of federal law having done it? I suppose someone would bring that lawsuit, but, Your Honor, if someone were to bring it as it was brought in this case under the Supremacy Clause for a violation of 30A, one has to look at whether or not 30A requires the legislature to do anything. It requires the State Department to submit a state plan. Let's cut the question. All right, the legislature can do what it wants, but the next day you or your client as the head of the department is going to have to put out some rates, which are going to have to comply with the legislature because that's the state relationship. At that point, is there a violation? Because nobody has done anything at that point. Your Honor, it's not under 30A that the violation would be. If the legislature were to do something as this hypothetical proposes, it would probably violate other notice requirements, but not 30A. That's because you're assuming that orthopedic is no longer the law. It's not because orthopedic is no longer the law. Even if orthopedic was the law, orthopedic does not require the legislature to have to look at it. That's why I set up the hypothetical differently, okay? You as the director, I'm giving you your premise, okay? So your client as the director still is going to have to put out a statement about rates. And as a practical matter, their statement is going to be the legislature's statement because in the relationship within the state law, that's going to have to be so. So let's forget the legislature. Let's just say that the director is now putting out that rate. Why? Because the legislature makes it. All right, now is there an orthopedic violation? We're assuming orthopedic is good law. Yes, we are. Even if orthopedic is good law, if the department were to do its reasonably principled analysis and find that the new 10% did not violate 30A, then no, there would not be a violation. It depends on what analysis is. After the fact and without having and knowing that the actual impetus was totally a budget reason and no other. What the legislature does is not require under 30A. They can look at the budget. They can look at other things. However, 30A does not impose a requirement on what the legislature... We're now five minutes over. We will give you your five minutes to rebuttal, and thank you very much for your questions. Your position about orthopedic is give me a break, right? Thank you. Okay, now, how are you dividing your time? If the court please, I'm Lennox Carmen, and I appear for the plaintiffs, and we have agreed to split our time 15 minutes for the plaintiffs in respect to the pharmacy, and Mr. Craig Caniso will address the court the other 15 minutes on all the other providers and accept that I will also address the court on the issue of the injunction in November for the home health services and for the non-emergency medical transportation. Who was going to do that? You were going to do that? Who was going to talk about the November injunction? You want me to talk about that? No, I'm just asking you, who is going to do that? I am going to do that. Okay, go ahead. Right, right. And how much time are you taking? You mentioned two other people taking 15 minutes. Oh, no, just Mr. Caniso is going to take 15 minutes, and I'm going to take the first 15 minutes. Go ahead. Okay, but there are only two of you that are arguing that, because you only have 30 minutes. Right, right. And the other thing I would ask permission for, I don't think it's necessary, because I've been able to follow the arguments very well, thanks to technical assistance here. But just in case, could Mr. Friedman stand here, and if I miss a question, write it out for me. Sure. I really believe that much of the court's questioning has made unnecessary much of the argument that I otherwise would have made. But I do remember President Ronald Reagan used to say, there you go again. I should say that we are banned by orthopedic. Orthopedic is a top standard. Yeah, right, right. It seems extremely difficult to comply with under some circumstances. Do you agree with that? I mean, for example, how would you do a physician cost study? Well, I'm not prepared to answer how that would be done. There are experts in the Department of Health Services that would be able to do that. I take the position that all the case law requires agencies who adopt rates or enact rates under the Medicaid Act must use a reasoned, principled process. And it's our contention that So you would regard orthopedics as just a specification of that broader requirement. And our view is that orthopedic used that rule substantial and came to the right conclusion in respect to the providers that they were addressing at that point. All right. So what about the pharmacies? Because you said that's what you're going to address. I mean, as I understand it, the record here on the pharmacies is the most complete. Yes. In the sense that there was a December 2007, so fairly relevant in time, Myers-Stauffer study of pharmacy costs. Yes. And so in a way your argument isn't that there wasn't one, it's that it wasn't a good one. Well, the Myers-Stauffer study was a good study. And it showed in Exhibits 17 and 18 that all of the top 200 brand drugs that were the top gross price drugs would cost more to acquire than what Medi-Cal was going to pay under this 10 percent cut. So it was impossible for any pharmacy to dispense brands. But I gather the counter argument to that is, well, it isn't impossible because pharmacies look at their bottom line and might well, if they weren't totally dependent at least on Medi-Cal patients, maybe with half or a third of their clientele could continue to serve them and the contentions of the larger pharmacies do because they're at least covering a lot of their basic costs with this and they're also getting people into the store to buy other things. And so therefore some degree of discount on actual costs is dealable with. That's what I understand the argument to be. Yes, Your Honor. There was an engineer once who analyzed the ability of hummingbirds to fly and he concluded impeccably with physics and calculus that it was impossible for hummingbirds to fly. And this theory promulgated by such an engineer, in my opinion, is destroyed by the evidence that pharmacies don't act as they predict. The department will have you believe that two-thirds of your gross consists of brands and if you lose money on acquiring every brand, nevertheless you will blindly dispense money losing hundreds of thousands of dollars a day hoping that maybe their theory is correct. Well, that's totally beyond human experience. Just to be formalistic about it. Yes. The orthopedic hospital requirement is a procedural requirement. Exactly. They did have some cost information. Yes. No, they didn't because the basis of orthopedic was that it was not based on any cost study. No, I mean in this case, as to the pharmacies, there was relatively recent cost information which you could then apply the 10 percent discount to and you could come to some conclusions about the degree to which costs were going to be covered. So why is the procedural requirement met and why is your dispute a substantive dispute? Well, because the district court found that the legislature did not consider quality of access in enacting Section 38 and that is in and of itself a violation of 38. It is in itself a conflict. Even though the information existed in an official study of the department. Yes. And even though you could, anybody with a calculator could at least come to some conclusions based on that study on the fact that we don't know that they did it is the problem? Well, first of all, Your Honor, the state director in her appeal never raised the ground of appeal that the legislature did not consider quality of access. So that's not even an issue on appeal because they didn't raise it. Well, they're certainly taking a far off position and they're not getting too close to the issue. I'm asking you because it's illuminating of what the underlying standard actually is under orthopedic hospital. Does it mean that the legislature has to read the studies even though they exist? Well, there's no doctrine that the legislature knows when every sparrow falls from the sky and the legislature knows of every study that every agency in the state has done. You have two possible positions. One is that they have to have read it and they didn't, and the other is that it was just a bad study, which is part of your, you also argue that, that it was, that its conclusions don't make any sense because of the reasons you've been talking about. Well, the legislature made no study. It did not refer to the Myers-Thompson report. There's no evidence that it did. And it had the burden. But then we have a sort of harmicera problem. I mean, if the thing existed and it would have been sufficient, then why are we standing on ceremony about whether somebody read it? Okay, well, Belsey Orthopedic addressed that exact problem because in orthopedic the court found that the director had not considered quality and access. But the director said, oh, I have a study by the most impeccable expert that shows that the rate is high enough. And orthopedic said, well, too bad for you. But that was after the fact study, right? This is not an after-the-fact study. It was a pre-the-fact study. Well, what I'm trying to say, Your Honor, is that orthopedic held that by reason of the fact that they had not considered quality, that, therefore, the rate setter could not rationally conclude there was any relationship between the factors required to be considered and the rate, so that, therefore, the rate was arbitrary and capricious and unlawful. But wasn't that an after-the-fact study? Well, I believe it was an after-the-fact study that, as Judge Levi and Claywell said, the fact that there is a study that shows if that were the case, which it's not, that the rates are high enough, it's purely by accident. And Judge Levi pointed out that when rates are set without reference to quality or access, it is unlikely that the rates are consistent with quality. Your ultimate position is really that the legislature here was motivated only by budgets and nothing else, and that that they can't do, and that's the end of the story, essentially. Well, and I don't – Which is a viable position and which may be consistent with the law of other circuits. Well, it's our position because, as Urbino v. Shalala says, the court shall consider the reasons given by the rate setter. And what were the reasons given by the rate setter, the legislature, that – Legislatures don't give reasons. That's why it just seems like a mismatch. Well, what I'm saying – The legislature. What I'm saying, the legislature did give reasons. And the reasons it gave was that we are doing this purely for budgetary reasons. So we have to take the legislature at its word that that's why it passed. And that's evidence that they passed it for budgetary reasons. Do you want to briefly talk about the record with regard to the other two categories in the November injunction? Yes. You want me to address that issue? It would be helpful, yes. Huh? Yes. Oh, okay. Well, our position on that is to begin with that this is an appeal and not a trial court. And the brief that the attorney general wrote was addressed to a trial court to weigh the facts de novo and to reject our evidence and to accept their evidence. But too bad for them. This is an appeal. The district court meticulously went over the evidence, meticulously stated two or three pages of what the evidence was. And then the attorney general comes in here and on appeal does not set forth all the evidence favorable to the plaintiffs and instead says, oh, their evidence was insufficient. See pages 20 to 500. And you college judges try to find out what the evidence is. As to reputable harm or as to likelihood of success. Irreparable harm or likelihood of success. As to what? What was the evidence? Yes, irreparable harm or likelihood of success. What was the evidence? What is it that you're saying that they're not accepting the evidence on? The harm evidence or the likelihood of success evidence? Or both. Well, I'm talking about the irreparable injury harm. Let's backtrack because we haven't really been talking about that much. What about the likelihood of success issue? Well, the likelihood. The kind of issue that we were talking about with respect to the pharmacy. Right. The likelihood of success is exactly the same as the pharmacy case, as the doctor's case, as the other providers who were benefited by this order because in each of those, the legislature broadside failed to consider quality access to any service. All they considered was in the act it says that this act addresses the fiscal emergency declared by the governor in order to make statutory changes needed to implement cost containment measures affecting health services at the earliest possible time that these sections will go into effect immediately. Also, they had a provision in AB 5 that the legislature declares that we face a fiscal crisis that requires unprecedented measures to be taken to reflect general fund expenditures. So when they three times cried out that we're doing this for budgetary reasons only, I think the court has to accept and the district court did accept that the legislature did it for purely budgetary reasons and on appeal they have not shown any evidence why that does not sustain that ruling by the trial court. And also, curiously enough, they have never challenged the correct proposition that it is the defendant, the state, in a rape case that has to produce a record which the court can review, which discloses that the agency used the correct procedure in arriving at the rape. And this was pointed out by the district court in the order and they have accepted it on appeal. They have not challenged the requirement that on appeal is the burden of the district court. It was the burden for the state to produce something, something, to show that something else but money was considered. Okay. So you're about at your 15 minutes. Yeah. How much time do I have? Oh, we want to address quickly one at the minute retroactivity. As I understand it, it's at Enbridge side of this. Yes, and also it's important to recall that the district court did not initially make this ruling, but the district court, after 18 days of very careful consideration, issued a decision that it was retroactive. And then after it had made this very considerate decision, the attorney general objected to it, and there was a hearing set on the 28th on contempt. And on the day before that, the district court in Chambers issued an order deleting the retroactivity and making it retroactive only to August 18th. So it's your argument that it should be that you should get the money back to July 1st? Yes. Okay. All right. Thank you. All right. Thank you. Good morning, Your Honor. Craig Canizzo for the interveners. We've divided the time, as Mr. Carman has indicated. Before proceeding to discuss the categories of providers that Your Honor showed interest in. Can I just focus on something? I didn't ask your colleague. Yes. Under lands council, we talked about before, I think the district court clearly assumed that there was a likelihood of success on the merits. Let's assume for a moment that there was just a serious question going to the merits and that you had to get to the balancing of hardship analysis. In that case, here we have the state of California essentially impecunious. If you win, isn't the state just going to take the money that it pays to you and take it from somebody else? And if so, how should that impact our analysis? Your Honor, this question has arisen in a number of these across-the-board Medi-Cal rate cuts before. And Judge Levy in the Clayworth decision directly addressed that very issue by suggesting that the one thing that the department can't do and the legislature is ignore the rate setting requirements in 30A. They, in California, have the broadest range of benefits and services and eligibility of anywhere in the nation, contrasted with the lowest payment rates by far. So in essence, you're saying that in this case, whatever the legislature may decide to do in response to this case, if you're successful, that's really not our concern for purposes of our equitable analysis. Is that correct? That is correct. Let me ask part of the question that is related to what Judge Smith was asking. He was saying you're answering this question in part by saying the answer to the legal question is clear. And he was saying to you, well, suppose it's not entirely clear. Suppose it's just a question, a serious legal question. But in which case, when you balance the scales, the question of the relative hardship becomes more substantial. Correct. And his question then is, and this case, of course, came up before the latest budget problem in the legislature. So he's saying, but let's assume it came up today instead of when it did come up, where the crisis was not as great because you had no reason to assume you would have an irrational legislature. But do we assume that we would have to take money from somewhere else because California has no money? Do we assume the legislature will not provide more funds by raising taxes, that the state's going to go broke if they give you this money or it's going to go broke anyway? What do we assume? And this is not the only case in which we have this question pending. Well, what do we assume about what the state's going to do? Do we assume that the state has to go broke or do we assume that it can raise taxes and solve these problems? Fortunately, I don't think this case presents that dilemma for the reason of the recent congressional action. The recent congressional action in the stimulus bill signed yesterday, I believe, actually provides an enhancement of Medicaid funding by increasing the federal matching percentage so that almost two out of every three dollars will be the federal funds for the Medicaid implementation in California. So at least on a short term, as long as that stimulus funding is maintained, and this has happened repeatedly in the last five years, Congress has spoken to the issue directly by saying we value this program enough that we are going to contribute an additional enhancement of the federal matching percentage so that you do not cut rates and you do not cut services. Essentially what California would do were they to implement these rates was to defy and run counter to national policy on Medicaid. Well, what is the evidence that California has the lowest reimbursement rate in the country? It's measured by the Kaiser Foundation. It's in the Declaration of Mr. Mould's. It is a per capita expenditure of about $2,700 per individual in the state annually compared. Of people who are covered by Medi-Cal. Covered by Medi-Cal compared to an average in the nation of about $4,600 and at the top end for states like New York approximately $7,000. It would be helpful to me to have you tell me what you think the orthopedic hospital requirement actually is. I mean, it does seem that to do cost studies for some of these categories is nigh unto impossible. Your Honor, I don't think that's true. And I'm glad you brought that up because I had it in my notes to respond to your question about how difficult is this procedural standard. It's not so much difficult. It's even conceptual. I don't know what it means to talk about cost for doctor's care and individual fee-for-service doctors. I mean, the cost is what they want to charge. I mean, they have costs. They have overhead. But aside from that is how much money they're going to want to make in order to stay in the business, which isn't really a cost issue. Go ahead. Medicare does this every year. They analyze every physician procedure, assign it a code, and analyze the cost of running an office. They even distinguish within their coding system between whether you provide that service in the office versus in the hospital. So for 1,500 procedures, whatever the right number is, they do it every year. This is why a lot of states. But really, that's not really a cost analysis. It is. Well, why is it a cost analysis? If I'm a doctor in an office, I have costs. I have to pay my rent. I have to pay my equipment. I have to pay my nurse and my staff. But beyond that, I have to decide how much money I want to make, right? So the real question is an economic question of how much do we have to pay doctors to have them stay in business. But that's not exactly a cost issue. Well, does the federal government treat it as a cost issue? They do analyze the actual cost of running an office. I understand all that, but that's going to clear pretty soon, pretty quickly, and then for doctors. Not for hospitals and pharmacies, but for doctors. The rest of it is them. So how do you factor that in? Well, the state legislature at an earlier time actually told the department what they wanted them to do. We cite the provision in the code. It's Section 14079, and it directs the director to annually review the rates, cost of inflation, prevailing rates for other payors. Well, that all makes a lot of sense. I mean, why we don't have anything in this record as far as I know? What insurance companies are paying and what Medicare is paying, I don't know, because that would tell you an awful lot about access issues. Is that information available to the state of California, the Medicare information? Absolutely, Your Honor. And most states actually peg, a lot of states, I should say, peg their rates as a percentage of the Medicare rate. So basically, had the legislature chosen to do so, it could have consulted in each of these categories. What's the Medicare? Medicare information and would have had the basis for a decision there. Correct. And the director announced when this annual review requirement was brought to her attention following the enactment of the cuts, she announced that it had been, quote, superseded by the cuts. So you do have the director in a difficult position, believing that they have to ignore the requirements of not only federal but their own state law in order to meet the budgetary constraints. But more to the point conceptually about the value of orthopedic, and I think that's explained very well in the application of orthopedic at the district court level in two cases, one in California and one in Arkansas that we cite in our brief. In Clayworth, Judge Levy explained the importance of having a record so that he could review and determine what was actually done in order to provide and it assured the state had there been a record it would be a deferential standard of review and abuse of discretion review. Every court that has been confronted with this has said exactly that. In Arkansas Medical Society, citing an earlier orthopedic ruling, the court pointed out the difficulty that a panel either at the trial court or at the court of appeal level, even worse, is faced with if there's no record to review because you have to conclude that none of the relevant factors were considered. So two things. First, as I hear what you're saying is that orthopedic doesn't have to be read as necessarily always requiring a cost-based study as opposed to a reasonable study based on relevant factors. So if, for example, they had done comparative costs and looked at what Medicare was paying and what insurance companies were paying and come to some conclusion on that basis, that would have been okay too. Absolutely. It's not exactly what orthopedic says if you take it as requiring an actual cost study. Orthopedic was confronted with a difficult dilemma by virtue of the circumstances of that case, which was that because the department's view was they could ignore the cost of hospital operations and treat them as if they were a doctor's office and left the court with no out, if you will, because the emergency rooms had to stay open. So there could never be an access-only measure of compliance with the criteria in 38. I wonder if I can switch you to a different subject. We've got so much to cover here, but this is one I really hope you're going to be able to help here. As you know, there are a lot of different takes on EMBRI. And one of the questions that I have is what do you cite, either in the California Code of Civil Procedure or anything else that indicates that prior to the time that this case was removed to federal court, that the state of California had waived its sovereign immunity? Certainly. Do you understand California to have had sovereign immunity with regard to the issue of retrospective relief here in state court? In state court, no, and I think that goes directly to the answer. And, in fact, we brought to your court's attention a recent ruling just in the last month, and it was denied yesterday by the California Supreme Court. Can you give us that cite again, please? It's Mission Regional Medical Center v. Bonta. And in that decision... What's the cite? Oh, excuse me, Your Honor. Let me go back. It's a Westlaw cite because it's so new. Right. It's 2008 Westlaw 4927432. 4927432. Okay. And that case very quickly involved a budget freeze rather than a cut, and it was enacted about three years ago right after the 2003 5% cut, which was enjoined by Judge Levy and Clayborough. So this has kind of been a fairly active period. And Mission Regional Medical Center held that there was no state sovereign immunity. It held that the legislature's enactment of that violated federal law and ordered the department to recalculate the rates going back, by definition, four years for those hospitals whose rates had been frozen. And that was because it was brought pursuant to 1085 of the California Code of Civil Procedure. Okay. So you're doing the CCP 1085. That's a mandamus statute. It is. And the decisions applying that rule in the county of Los Angeles... Is this a federal court decision or a state court decision? Which DCA? I think it's... Let me bring up... Second. It may not be indicated. There's actually several decisions, Your Honor, digested in our state cases in our reply brief. Los Angeles County v. State Department of Public Health is a second DCA decision involving Los Angeles. Santa Ana Hospital Medical Center v. Belle Che, the 1997 decision, is a fourth DCA decision. So your position is that the state had no sovereign immunity in the state court. That's correct. And, therefore, whether we go under Embry or Loppy Days, it doesn't matter because if they didn't have it then, they don't have it now. That's correct. The Mission decision, just to fill that in, is a third district DCA decision from Sacramento. And it's specifically ordered that the rates be recalculated retrospectively going back four years from the date of the decision, 2008. So it inherently addresses the issue of whether there was an immunity. The state actually petitioned to the Supreme Court on that theory that this somehow was inconsistent with their sovereign immunity. And the cert was denied yesterday. So your perspective is that any way you cut it, the Loppy Days, Embry, whatever, because the state had no sovereign immunity in the state court, that by definition there is no problem in the district courts moving the rate payment back to July 1. Correct, Your Honor. And there's actually, I just remembered, I believe it's the third district DCA decision in the California Association of Health Services at Home, the Bonta, that precisely addressed this retroactivity and actually said that they could get the retroactive relief but couldn't get the prospective relief because of the fact that the state plan had been amended prospectively but had not been amended retrospectively to address that retrospective issue. That's, again, a 1085 writ of mandate decision from 2007. And you're treating the mandate, the writ of mandate, the same as an injunctive relief? Well, wasn't this case filed as a writ of mandate? It was originally. It was originally filed as a writ of mandate in the state superior court of Los Angeles County. With respect to it, so we did want to address the access analysis, the cost analysis. What orthopedic emphasizes and the cases applying orthopedic emphasizes is that a deferential standard will apply, but you have to have something to review. But you're not insisting that it has to be cost-based, necessarily. It needs to be all those factors. And I actually think that the state statute addressing physicians and dentists specifically provides the other ways of getting at the relevant considerations that isn't cost-based. Obviously, Your Honor, if the ultimate touchstone is if Judge Carlton in the Clark v. Kaiser decision addressed very specifically how access is to be measured, if that was affirmed on review, in Clark v. Coy, I believe I have that site in my book here. I would think it could be measured. 758F572, and there's a Ninth Circuit Affirmance and Reversal on Other Grounds. That was a dental Medi-Cal rate case. And right after the 89 amendments, which we relied heavily upon, that said that the purpose of 30A is to provide adequate rates so providers participate at a level that provides reasonable, equal access to measures. So you have to know something about what the access is to other people. In the geographic area. And you have some comparison, but you wouldn't necessarily have to get at cost. Getting back to the director's admission when these cuts were passed, they acknowledged they had not done that analysis in 15 years, that the statute, in effect, had been superseded by these budgetary bills, and they felt compelled to implement them. But it does prevent, in our view, an obligation for the department, nevertheless, to do the analysis and to supply that analysis back to the legislature. And I think the ultimate point I want to make in that regard, Your Honor, they rely very heavily on fold-in. But I suspect they may not. The finding, of course, seems to be fold-in-like, but you'd say it fails at any rate. Well, to me, the most remarkable thing about reliance on fold-in is how it differs so dramatically with this situation. And I'd like to quote from finding 55. This is in the district court decision, which is actually where all the meat of that case is. It's not in the court of appeal decision. There's a series of findings between 53 and 56 that are numbered in that decision. Just excuse me a second. It's right here. And I think it highlights exactly what is backwards in the director's position in this case and how the rate setting has occurred. I'm going to have to actually just go right to the findings. But your basic point, as I understand it, is that if you apply to fold-in standard, you still come out the same place. Well, in fold-in, what was remarkable, and I apologize for not having the exact language in front of me because it's an 80-page opinion, the trial judge was very struck by the following. The rates have been consistently recommended and appropriated for as an entitlement. And the judge was persuaded that there was an independence between the rate setting and the budgeting process and that they weren't one and the same. And they said he went out of his way to point out that it appeared credible and bona fide that there was an independence in the Department of Finance who felt that the program had to be treated as an entitlement. It had to be properly funded. Doesn't fold-in really, isn't that a construction of the Boren Amendment again? Completely, Your Honor. So it really doesn't have anything to do with 30A and somewhat in opposite to this case. It's certainly in opposite legally, but I think it's the factual difference that I think is so dramatic. A similar dichotomy is their reliance on Rite Aid v. Houston out of the Third Circuit because in that case, the very first holding by the Court of Appeal was approving of the district court's decision to exclude evidence that the providers wanted to augment the administrative record.  But what do we do with the fact that legislatures don't have administrative records? And except under Section 5 of the 14th Amendment, which is its own little bailiwick, there's never been an insistence on knowing what the legislature knew or considered. So is the question what the department knew in advance what was available to the legislature or what about their argument that they did it afterwards between the time of the legislature's decision and July 1st of the implementation? Well, Your Honor, our view is that under orthopedic, it has to be done in advance. Okay. I assume. If it's the legislature, who's acting? Well, the legislature and the administrative office of the state government can in most states and do work hand-in-hand. They receive the information from the administrative agency as to what is needed and the legislature either adopts it or ignores it, but it doesn't act in a vacuum. Well, it also has hearings, doesn't it? Yes. Occasionally. And in the mission decision that I cited to bring your attention, the problem with trailer bill 24-hour passage without hearing of rate freezes or rate cutbacks was highlighted in that decision and was the basis for a significant basis for the decision. That there can be no consideration of the relevant factors when it occurs that way. So it is not an impossibility for the agency to provide the very thing that Welfare and Institutions Code 14079 requires them to do annually to make their decision-making regarding rates more informed. The legislative analyst report that you cited many times specifically pointed out that the department's conduct or rate setting is ad hoc and ignores the need to do this annual analysis. It's a vacuum that's been created. Isn't it? I mean, I don't mean to be pejorative, but the fact is isn't it a bit of legislative laziness? Isn't it quite common for legislatures that want to comply with federal mandates to have findings of fact, if you will, as the preamble to the bill? Like, for example, highway funding. That's another federal program. If you want that money, you've got to do certain things, and many times there is a preamble that recites certain things. The only preamble in this case, of course, as you know, is the citation of it. I'm just saying that this is not a great burden on the legislature to simply say, you know, this is a very important time. We've got all these problems here. We've got these issues. But the department has analyzed these Medicare studies. Our staff and we in the committee have looked at these things, and having done so, we find that, you know, and go through and then enact the bill as they've done. That would not have been that difficult to do, would it? It would not only not be difficult, it was done at earlier times and is currently being done in other states. Again, when you drop to last in the nation and not by a little bit, something is adrift. And I think it's perpetuated by the director's rather, we call it the myth, that the director for decades has perpetuated, which is that there are no state standards for rate setting. There's only the federal minimum standards. But when it comes to those federal standards, they are not subject to scrutiny or not subject to review. One thing in the record, Counsel, that indicates what you just did, which is that in previous years there were, in fact, such fact-finding analyses that were part of the Medi-Cal bill. In the 2003 5% rate cut in Clayworth v. Bonta, there were hearings over the Medi-Cal rate changes. They, ironically, did not support the actual cut, and that was one of the basis upon which Judge Levy in Clayworth felt compelled to issue the 5% injunction just four years ago. But the hearings actually had all the witnesses testifying, including the legislative analysts, whose recommendations were all documented. Did the bill refer in any way to the hearings or the legislative analysts' work? They were part of the legislative history. Okay, but not in the bill itself. Not in the bill. Do you think there might be some old ones that do have it in the bill itself? I don't recall. Yes, actually there was an augmentation in 2000, the first in only maybe in 20 years. That was that one windfall year in 2000 when the add-on of a small percentage of funds was allocated for the Medi-Cal funds. And there was an explanation of that. Your time is very much up. Thank you very much for your argument. Can I get right to one question that I asked to the previous counsel, and that is, is it the state's position that it retained sovereign immunity in the state court on this matter? Your Honor, yes. And on what do you rely? I know that counsel is referring to the Mission Regional decision. And several others, the Los Angeles case and others, in which it seems fairly routine under exactly these circumstances for the state courts to provide retrospective relief. What are you relying on? None of those other state court decisions were brought as a supremacy cause of action. I know that there was a 1085 writ proceeding or cause of action alleged in the original complaint, but the petitioner has dismissed voluntarily everything but the supremacy clause. I don't understand what that means. He brought a mandamus action, and he said this is violating federal law. That's one of the things he said, right? Your Honor, actually. What is special about a supremacy clause cause of action? It has been the director's position all along that there was no actual mandamus cause of action. There were certain words in the pleading that had mandamus language, but the only cause of action were all federal statutes, the ADA, the rehab act. Is there a mandamus action in state court alleging that there's a violation of federal law? The state retains sovereign immunity from suit in its own courts, and on that basis the state has sovereign immunity in the state courts. I'm not understanding the answer to my question. I'm sorry. Is it not routine to cast a mandamus action in state court on the basis that a federal rule here, the rule that federal law is supreme, is violated? Is that not a routine way of proceeding in state court? Had this complaint been filed as a mandamus action, it could have been, but that's not the case here. What was filed in state court? It was filed as a mandamus action. That's a lie. That's a lie. What he means is he disagrees. Your Honor, there were words in the pleading that sounded like mandamus, but the causes of action were supremacy clause, violation of the 14th Amendment. How are those distinct? When you bring a mandamus action, you have to have some basis for your mandamus. So you say the reason for the mandamus is you're violating the ADA or the reason for the mandamus is you're violating the supremacy clause. The fact that they alleged a substantive reason for granting mandamus doesn't prove it wasn't a mandamus. But that's exactly my point. There was no cause of action for mandamus. Let me switch over a little bit then. Can you cite any case, federal or state, that says that if a mandamus or a mandate is filed under 1085 of the Code of Civil Procedure or using that in the state of California and the supremacy clause is the basis of the claim that the state retains sovereign immunity? I can tell you that there is no decision that says the state does not. This is the great black hole of you can't tell me there is one, but you tell me there isn't one. I can tell you that there isn't one. Okay. So there's no authority you can cite that says that. So if we construe by the very fairly lengthy list now added to by this mission case of claim dealing with Medi-Cal that have gone on a writ of mandate basis and the fact that the court has entertained them and some of them have been removed to federal court, can we assume by that that the state no longer has sovereign immunity? No, Your Honor, and for two reasons. The U.S. Supreme Court has been very clear that there can be no retrospective injunctive release and that the date where a court is supposed to decide whether something is retrospective or prospective is the date that the court first finds that the state was in violation. In this case, that date is August 18. And so when the district court found... I mean, it's an admirable mental exercise to go back to basics, but it isn't very admirable to ignore existing case law and ask us to ignore it. We're not asking this court to ignore either Embree or the PD. Aside from the issue we're discussing now, why doesn't Embree just apply by whatever the stated state law was? Embree doesn't apply because it's distinguishable on its facts. What Embree dealt with is removal from state court where it had to do with form shopping. And the Supreme Court... We know the Lapidus said that doesn't matter. The Lapidus... Specifically said it doesn't matter. The Lapidus court dealt with a state cause of action being removed to federal court. It doesn't matter whether you're form shopping. And Embree actually said that... It doesn't matter whether you adopt the Bright Line Rule. What is the Bright Line Rule? The Bright Line Rule is if a state removes under one of the two types of sovereign immunity under the 11th Amendment, whether it is immunity from suit or immunity from liability. In Embree, it was filed as an immunity from suit. What the state did was remove the federal court and then say that, no, we're immune from suit in federal court. That is what Embree dealt with. Embree said if a state does that, then there's a Bright Line... What they were trying to do in Embree was to say, for example, that we're at least immune as to the causes of action that were added later. And the court said, no, no, no. When you remove a suit, you remove the whole suit. Yes. Embree removed the case, removed the whole case, including the claim for prospective release and the claim for retrospective release. Both Lapidus and Embree don't seem to like dividing things up that way. I don't think it's illogical, by the way. I think that what you're saying is not illogical, but the cases don't seem to see it that way. Your Honor, the cases on its fact are very clear. In Lapidus, the state removed a state cause of action. And in that decision, the decision mentioned several times that it's the state cause of action that was removed, but the court was not going to allow to be immune under the 11th Amendment. Let me ask you a different question to maybe solve this problem. The 2nd, 4th, and 7th circuits have taken the position that whether a relief is prospective or retrospective depends on the date of service, not on the date of payment. How would the state feel about our picking date of service and siding with our fellow or sister circuits, as some say? By picking the date of service, this court would not be siding with a decision that is inconsistent with the position that the director is taking. What the director is saying is whether something is prospective or retrospective has to do with the date that the court first finds that the state has violated the law. Now, once the court has found that a set date exists as to when something will be retrospective or prospective, what counts is the date of service. So what that means is because there is a lag in the Medi-Cal program, a service may have been rendered today, but the claim will not be processed for weeks or sometimes months from now. So if the date that the court first said that the state had violated the rule was today, then the date of service would be what the court looks at. And I think that's the case that Your Honor is referring to, and that is the position of the department. The basic argument is about a month and 18 days, right? Yes. That's what we're talking about. Okay. I have one question, which is sort of minuscule, but it deals with the last thing you said because it made me curious. You had these declarations in the record that showed that the actual use of certain services had not gone down between July of 2007 and July of 2008, and I couldn't understand how you could have those numbers yet for the very reason you're saying. This declaration was filed on July 29th, and I wondered whether it was talking about services after July 1st or payments after July 1st. It was talking about, in some cases, both for payments after July 1st. Well, then it's an irrelevant number. It's not irrelevant. It's actually even more relevant because what the numbers show is that even before all the claims have been processed for the month of July, that there were the same number of claims submitted. Because they were from before July 1st. I'm sorry. I couldn't hear. Because they were from before July 1st for the reasons you just said because it takes several weeks. So if you're giving a number on July 28th or 9th or something, you're talking about services before July 1st almost surely. And because the declaration was done at the end of July, a bulk of those services would be from after July 1st. We have no clue is the bottom line. We have no clue when the services were. It's an irrelevant declaration, it seems to me, because it isn't about – it is not – couldn't possibly be isolating post-July 1st services. Your Honor, I believe that it was. I can't give you a site, but really what I can tell you is that the declaration that was submitted at the end of July does include services that were rendered after July 1st. And the declaration was clear that even though the number was equal to the number of total services – or I'm sorry, claims that were processed the year before in July – that all the claims had not been processed since after July 1st. And that's why there were more coming. Okay. Thank you very much. Thank you all for your very useful argument in a very difficult case. I very much appreciate it.  Yes, Your Honor. Your Honor, on a point of order, we wish to augment the record with a copy of the verified First Amendment complaint, which I drafted, and it's a 1085. It should be in the record or we can take judicial notice of it. Well, oddly enough, when I checked the record, it turned out that by clerical error they actually included two of our motions for mandamus under the supremacy clause. But did not actually include the First Amendment complaint. So it's very important. And I also wish to augment the record with proof of service showing that it was served well before July 1st. Thank you, sir. We are completed and we will manage to find the complaint because it is certainly in the court. Thank you very much. Thank you.
judges: Reinhardt, Fletcher W. , Smith M.